# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| SIERRA FRANTZ, | \* | |
| | \* | No. 13-158V |
| Petitioner, | \* | Special Master Christian J. Moran |
| | \* | |
| v. | \* | Filed: June 24, 2019 |
| | \* | |
| SECRETARY OF HEALTH | \* | Attorneys' Fees and Costs, reasonable |
| AND HUMAN SERVICES, | \* | basis |
| | \* | |
| Respondent. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>Ronald C. Homer & Christina Ciampolillo</u>, Conway, Homer, P.C., Boston, MA, for Petitioner;
<u>Daniel Principato & Debra A. Filteau Begley</u>, United States Dep't of Justice, Washington, DC, for Respondent.

### PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

   Sierra Frantz claimed that vaccines caused her to develop a demyelinating condition, later diagnosed as multiple sclerosis, a condition marked by lesions in the central nervous system.  She retained two experts to assist her, and the Secretary matched with two experts.  In a ruling from the bench, the undersigned found that the evidence showed that Ms. Frantz was already suffering from pre-clinical multiple sclerosis when she received the allegedly causal vaccines.  The primary evidence supporting this finding was an article Francois Cotton wrote in 2003 about the duration of lesion enhancement.  Because Ms. Frantz had at least one lesion in her brain that probably existed before the vaccinations, the vaccines

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website.  This means the decision will be available to anyone with access to the internet.  Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4).

could not have caused the demyelinating condition. Thus, Ms. Frantz was not awarded compensation.

Following this denial of compensation, Ms. Frantz moved for final attorneys' fees and costs. She requested $326,914.44, later amended to $352,451.91. The Secretary countered that because Ms. Frantz had not established a reasonable basis for the claim set forth in her petition, Ms. Frantz should receive no attorneys' fees and costs. The parties subsequently developed their positions on reasonable basis and then participated in an oral argument on that issue. For the reasons explained below, she is awarded $135,187.59.

\*       \*       \*

## I.      Background

### A.      Cotton and W.C.

The Cotton article was a key aspect of the decision denying Ms. Frantz compensation.[2] Cotton was discussed in a case highly similar to Ms. Frantz's case, W.C. v. Sec'y of Health & Human Servs., No. 07-456V, 2011 WL 4537877 (Fed. Cl. Spec. Mstr. Feb. 22, 2011), mot. for rev. denied on relevant grounds, 100 Fed. Cl. 440 (2011), aff'd, 704 F.3d 1352 (Fed. Cir. 2013). Thus, this background material is set forth to provide context for the developments in Ms. Frantz's case.

Like Ms. Frantz, W.C. was a healthy individual who received a flu vaccination, developed neurologic symptoms, and was diagnosed with multiple sclerosis. W.C., 2011 WL 4537877, at \*2-3. Represented by the same law firm that represents Ms. Frantz, W.C. alleged that the flu vaccination caused him to develop multiple sclerosis. W.C. retained Carlo Tornatore, a neurologist, who offered an opinion that the vaccine did, in fact, cause W.C. to develop multiple sclerosis. The Secretary presented the view of Arun Venkatesan, also a neurologist. Dr. Venkatesan opined that the presence of non-enhancing lesions on W.C.'s initial MRI meant that the lesions must have formed before the vaccination. The parties were instructed to present evidence about how long lesions enhance on MRIs.

The undersigned found that the Cotton article was the most informative study. In Cotton, the researchers performed MRI scans on a collection of patients

---

[2] Exhibit D, Tab 3 - Francois Cotton et al., MRI Contrast Uptake in New Lesions in Relapsing-remitting MS Followed at Weekly Intervals, 60 Neurology 640 (2003).

every week.  This level of regularity made the Cotton research more granular than earlier studies in which the MRIs were repeated monthly.  Cotton and colleagues found that half of the lesions studied were enhancing after 14 days.

The metric from Cotton was then used to evaluate the MRI that W.C. underwent 17 days after vaccination.  W.C.'s initial MRI showed six non-enhancing lesions and no enhancing lesions.  The presence of non-enhancing lesions, combined with the knowledge about the duration of enhancement Cotton supplied, was the basis for Dr. Venkatesan's opinion that W.C.'s lesions pre-dated the vaccination.

The (undersigned) special master credited Dr. Venkatesan's opinion and found Dr. Tornatore's contrary opinion unpersuasive.  The undersigned found that W.C.'s first MRI was taken close enough in time to the vaccination that at least one lesion of the six lesions should have been in the enhancing phase.  However, W.C.'s lesions were not enhancing, which implies that the lesions were beyond the initial enhancing phase and could not have been caused by the vaccination.  Thus, the (undersigned's) decision found that W.C.'s lesions pre-existed the vaccination and the vaccination could not have caused the lesions.

Still represented by the same attorneys, W.C. filed a motion for review. The Court of Federal Claims evaluated whether the factual finding regarding the duration of lesion enhancement was arbitrary or capricious.  W.C., 100 Fed. Cl. 440, 451 (2011), aff'd, 704 F.3d 1352 (Fed. Cir. 2013).  The Court described the special master's interpretation of the range of enhancement for lesions in the Cotton article and did not dispute that interpretation.  Id. at 451-53. The Court agreed that the lesion enhancement timeline proposed by W.C. was possible but also stated that the special master's finding of a longer enhancement timeline was "quite possible."  Id. at 453.  The Court found that the special master's finding on the duration of lesion enhancement was not arbitrary or capricious.  Id. at 461.  The Court, consequently, denied the motion for review.

W.C. next appealed to the Federal Circuit.  The Federal Circuit again evaluated the special master's finding on the duration of lesion enhancement under the arbitrary or capricious standard.  W.C., 704 F.3d 1352, 1355 (Fed. Cir. 2013). The Federal Circuit agreed with the special master's explanation of the enhancement timeline for lesions described in Cotton.  Id. at 1359.  Further, the Federal Circuit found that the special master's finding on the duration of lesion enhancement was not arbitrary or capricious and that the special master's finding that W.C.'s lesions pre-existed the vaccination was also neither arbitrary nor capricious.  Id. at 1359-60.  Thus, the Federal Circuit affirmed the judgment

denying compensation.  Id. at 1361.  The Federal Circuit issued its opinion on January 13, 2013, a few months before Ms. Frantz filed her petition.

B.   Brief Factual Summary for Ms. Frantz

At twelve years old, Ms. Frantz had previously received all her scheduled vaccinations and was generally healthy.  On August 6, 2010, Ms. Frantz received the tetanus-diphtheria-acellular pertussis ("Tdap") and hepatitis A vaccinations. On August 9, 2010, Ms. Frantz's mother called her doctor and reported that Ms. Frantz had been off-balance, dizzy and sluggish since August 7, 2010, and later went with Ms. Frantz to the emergency room for these neurologic symptoms.

Ms. Frantz's neurologic symptoms worsened, and she underwent her first MRI on August 12, 2010.  This first MRI revealed one enhancing lesion on her brain stem as well as two non-enhancing lesions in her upper medulla and left periventricular region.  After subsequent MRIs, Ms. Frantz was ultimately diagnosed with multiple sclerosis.  Ms. Frantz continues to receive treatment for relapsing remitting multiple sclerosis.

C.   Entitlement Litigation

Ms. Frantz sought compensation under the Nation Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 through 34, alleging that the Tdap and hepatitis A vaccinations she received on August 6, 2010, caused her to develop a "neurological demyelinating injury."  Pet., filed Mar. 4, 2013, at 1.  After completing her initial submission of medical records, Ms. Frantz filed a statement of completion on January 13, 2014.

The Secretary reviewed Ms. Frantz's evidence and recommended against an award of compensation.  Resp't's Rep., filed May 1, 2014.  In the Secretary's recitation of Ms. Frantz's medical history, he noted that the August 12, 2010 MRI detected two non-enhancing lesions.  The Secretary also noted that Ms. Frantz's differential diagnosis included acute disseminated encephalomyelitis ("ADEM") and multiple sclerosis.  The Secretary argued that compensation was not appropriate because Ms. Frantz had not offered a medical theory connecting the vaccinations to her symptoms and that the temporal association between the vaccinations and the onset of symptoms was insufficient to establish causation.  Id. at 8-10.

During a May 12, 2014 status conference to discuss the Rule 4 report, the Secretary again raised the issue that a one-day onset of symptoms was a problem with the feasibility of Ms. Frantz's claim.  In the subsequently issued expert

instructions, the experts were directed to identify all pertinent medical facts that support their position.  Expert Instructions., issued June 16, 2014, at 3.[3]

Ms. Frantz filed the first report from Dr. Tornatore on November 25, 2014. In the medical history and summary, Dr. Tornatore noted an enhancing lesion and two non-enhancing lesions in the August 12, 2010 MRI.  Exhibit 36 at 5, 56.  Dr. Tornatore opined that Ms. Frantz first suffered from ADEM that subsequently evolved into multiple sclerosis.  Id. at 57.  Dr. Tornatore further opined that ADEM could have an onset as early as two days post-vaccination, but vaguely stated that Ms. Frantz's symptoms started "several days" post-vaccination.  Id. at 58.

Following a status conference discussing Dr. Tornatore's first report, the undersigned ordered a supplemental report from Dr. Tornatore to address the Althen prongs more fully and to answer other specific questions.  Order, issued Dec. 3, 2014.  Ms. Frantz filed a supplemental report from Dr. Tornatore.  He stated that the first neurologic symptoms of Ms. Frantz's disease occurred on August 7, 2010, the day after the vaccination.  Exhibit 38 at 6.  Comparing the wild pertussis infection that precedes the onset of ADEM with the pertussis toxin in the Tdap vaccine, Dr. Tornatore argued that the Tdap vaccine could cause ADEM.  Id. at 4.

On April 30, 2015, respondent filed the first report from Subramaniam Sriram, also a neurologist.  Dr. Sriram responded to Dr. Tornatore's report but noted that he had not reviewed the MRIs, only the descriptions of the MRIs in the medical records.  Exhibit A at 1.  In regard to timing, Dr. Sriram noted that the lesion on Ms. Frantz's medulla would have caused her ataxia (failure of muscular coordination) two days after the vaccinations but opined that it was "highly unlikely" for the medullary lesion to have appeared in two days.  Id. at 7.  Dr. Sriram further doubted that the medullary lesion could have even developed within six days, the time span between vaccinations and the August 12, 2010 MRI, and, thus, did not believe the vaccinations caused this lesion.  Id.

A status conference was held on May 11, 2015, to discuss the expert reports. Dr. Sriram was ordered to file a supplemental statement to address some omitted

---

[3] Although Ms. Frantz challenged the instructions on the basis that the expert reports should not constitute direct testimony, special masters possess the authority to structure the submission of evidence.  Order, issued June 16, 2014; see also K.L. v. Sec'y of Health & Human Servs., 134 Fed. Cl. 579, 601-05 (2017).

qualifications questions,[4] and Dr. Tornatore was ordered to file a supplemental report to address some inconsistencies in his opinions regarding timing. Order, issued May 13, 2015. The timing inconsistency was that Dr. Tornatore had at one point proposed that an appropriate interval for vaccines to cause ADEM was 2-30 days but at another point had stated that Ms. Frantz's symptoms began the day after the vaccination. Id. During the conference, the Secretary noted that he was considering whether to file a motion for summary judgment.

Following the May 11, 2015 status conference, paralegals at the law firm representing Ms. Frantz requested and eventually obtained MRI films. E.g., time entry for 5/22/2015. In addition, the attorney for Ms. Frantz sent literature to Dr. Tornatore. Time entries for 6/2/2015 and 6/9/2015. Dr. Tornatore presented a third report on August 7, 2015. Exhibit 39. Dr. Tornatore argued that the Tdap vaccination at issue constituted a rechallenge to Ms. Frantz's immune system and in that circumstance the "immune response would be expected to be brisk," noting that a vaccine injury can generally occur in 1-3 days. Id. at 3. For the range of 1-3 days, Dr. Tornatore relied upon the IOM's report of a lag phase. Id. (citing exhibit 39, tab D, at 58).

At the August 27, 2015 status conference, the parties discussed Dr. Tornatore's recent report and respondent noted that she had forwarded the MRIs to Dr. Sriram for review to draft another report. Order, issued Aug. 28, 2015.

On December 4, 2015, the Secretary filed another report from Dr. Sriram primarily discussing diagnosis. In the discussion, Dr. Sriram stated that Ms. Frantz's two non-enhancing lesions predated the vaccinations because of the short time between vaccination and the MRI such that the lesions could not enhance and become non-enhancing in that short of a time period. Exhibit D at 1, 4 (citing exhibit D tab 3 (Cotton). Dr. Sriram believed that that Ms. Frantz had at least subclinical neurological events pre-vaccination. Exhibit D at 4.

On December 15, 2015, a status conference was held to discuss Dr. Sriram's recent report. Based on Dr. Sriram's conclusion that the two non-enhanced lesions predated the vaccinations, the undersigned stated that Ms. Frantz "probably cannot prevail on a claim that vaccination caused her neurologic condition," and cited W.C. v. Sec'y of Health & Human Servs., 704 F.3d 1352 (Fed. Cir. 2013), for that proposition. Order, issued Dec. 15, 2015. In response to the order, Dr. Sriram

---

[4] On May 27, 2015, Dr. Sriram filed a statement addressing the omitted qualifications questions. Exhibit C.

filed a brief report to confirm that MRIs are only in black and white and to address another question regarding the blood brain barrier.  Exhibit E.

After the December 15, 2015 status conference, two attorneys representing Ms. Frantz often conferred about "med lit."  See timesheets at internal pages 65-67.  However, the attorneys' entries do not identify what articles they were reviewing.  None of the entries from this time specifically list Cotton as an article being reviewed.

On March 16, 2016, Ms. Frantz filed a fourth report from Dr. Tornatore.  Dr. Tornatore did not challenge the usefulness of the Cotton article in measuring the duration of lesion enhancement.  Rather, Dr. Tornatore contested the reliability of Ms. Frantz's August 12, 2010 MRI.  Dr. Tornatore speculated that if the MRI used a different enhancement technique, then the two lesions may have been revealed to be enhancing and, therefore, be newer and have developed after the vaccinations.  Exhibit 40 at 3-4.

After an April 22, 2016 status conference, the parties were directed to coordinate on hearing dates in early 2017, and respondent arranged to submit a report from another expert to address whether the design and manufacturing process for the Tdap vaccine affects the comparability of the wild pertussis bacteria and the modified pertussis toxin contained in the vaccine.  Order, issued Apr. 22, 2016.  A pre-hearing briefing schedule was subsequently set.  Order, issued May 10, 2016.

On June 21, 2016, the Secretary filed the first report from Thomas Forsthuber, an immunologist.  Dr. Forsthuber disputed, among other issues, Dr. Tornatore's timing for Ms. Frantz's onset of neurologic symptoms.  Exhibit F at 8-9.  Dr. Forsthuber concluded that Ms. Frantz's onset of neurologic symptoms was too early to have been caused by her vaccinations.  Id. at 9.  As for vaccine design, Dr. Forsthuber argued that Dr. Tornatore's comparison of wild type pertussis and the pertussis toxin in the Tdap vaccine was inapt because the Tdap vaccine is chemically detoxified.  Id. at 7.  Due to the chemical detoxification, the Tdap vaccine would contain an inactive pertussis toxin that would not create a similar immune reaction to wild pertussis.  Id.

Ms. Frantz filed a motion in limine to exclude Dr. Forsthuber's opinions outside the anticipated issue of vaccine design.  The Secretary filed a response to the motion, and then Ms. Frantz filed a reply.  The undersigned denied the motion in limine on the basis that Ms. Frantz had adequate time to address Dr. Forsthuber's arguments beyond vaccine design with another report from Dr.

Tornatore or another expert.  Order, issued Sept. 9, 2016.  In the event that Ms. Frantz wanted to retain another expert, the undersigned stated a willingness to reschedule the entitlement hearing.  Id.

At a September 26, 2016 status hearing, Ms. Frantz advised that she had retained another expert, Lawrence Steinman, a neurologist with experience in designing vaccines.  The parties also discussed the possibility of delaying the entitlement hearing.  Order, issued Sept. 27, 2016.

Ms. Frantz filed another report from Dr. Tornatore disputing some details of Dr. Forsthuber's report.  Exhibit 42.  After a status conference on November 4, 2016, the entitlement hearing was set for September 27-29, 2017.  Order, issued Nov. 16, 2016.  Ms. Frantz agreed to those dates despite knowing that due to previous commitments in the schedules of Dr. Tornatore and Dr. Steinman, her experts would not attend the entire three-day hearing.  Id.

Ms. Frantz filed the first report from Dr. Steinman on January 17, 2017.  Dr. Steinman incorporated Dr. Tornatore's medical history and summary from his first report, including the notation of the August 12, 2010 MRI showing one enhancing lesion and two non-enhancing lesions, as a basis to support timing.  Exhibit 43 at 5-6, 40-41.  Dr. Steinman did not directly state the expected onset of neurological symptoms following the vaccinations but noted that "vigorous recall immunity" of the vaccinations could fit Ms. Frantz's time frame.  Id. at 12, 41.

The Secretary filed a response to Dr. Steinman's report from Dr. Forsthuber on March 27, 2017.  Dr. Forsthuber noted that Dr. Steinman had adopted the August 9, 2010 onset of symptoms from Dr. Tornatore's first report but did not acknowledge that Dr. Tornatore later stated Ms. Frantz's onset of neurologic symptoms as August 7, 2010.  Exhibit G at 13 (citing exhibit 43 at 40, exhibit 38 at 4).  Dr. Forsthuber disputed Dr. Steinman's asserted homology between the hepatitis A vaccine and other vaccines and, thus, concluded that Ms. Frantz would not have experienced a recall response, and a faster onset of symptoms, to the hepatitis A vaccination.  Id.

On April 11, 2017, the undersigned issued an order outlining the content of pre-hearing briefs and establishing a briefing schedule.  The order noted the parties' differences on the expected onset of Ms. Frantz's symptoms and the actual onset.  Order, issued Apr. 11, 2017, at 7-8.  At a May 1, 2017 status conference to discuss the briefing instructions, the undersigned advised the parties that based on his review of the evidence, Ms. Frantz may lack a reasonable basis to bring the case to an entitlement hearing.  Order, issued May 4, 2017.  In support of this

assessment, the undersigned pointed out Ms. Frantz's similarity to W.C. in that in both cases, the lesions seemed to exist before the vaccination.  The undersigned also noted that the one-day onset that Ms. Frantz's experts was advancing was also problematic.  Id.

On May 31, 2017, Ms. Frantz filed a final supplemental report from Dr. Steinman addressing Dr. Forsthuber's critiques of his report.  Exhibit 56.

Ms. Frantz filed her pre-hearing brief on July 27, 2017.  In regard to timing, acknowledging the August 7, 2010 (one-day) onset of symptoms, Ms. Frantz proposed an "amnestic response" to the vaccinations with rechallenge and recall as mechanisms to explain the quick onset.  Pet'r's Br. at 53.  As for the suggestion that two of Ms. Frantz's lesions pre-dated the vaccinations, Ms. Frantz first questioned why Dr. Sriram had not raised this issue in his first report, only raising the issue in his second report, and dropped a footnote detailing factual errors in Dr. Sriram's reports.  Id. at 55 n.35.  In another footnote, Ms. Frantz briefly argued that the Secretary and the undersigned had misinterpreted the Cotton article and the relevance of W.C. to her case:

> In W.C., the Special Master relied upon the Cotton article to conclude that one would expect to see enhancing lesions on brain MRI seventeen (17) days after vaccination. 2011 WL 453877 at *7-8. In Sierra's case, due to frequent imaging, non-enhancing lesions were documented on a September 14, 2010 [MRI] that did not appear on brain MRI just eighteen (18) days prior, on August 27, 2010. See Pet. Ex. 9, pp. 1455-1456, 1449-1450; see also Pet. Ex. 40, p. 2. The MRI findings in Sierra's case illustrate[] the arbitrariness of the findings in W.C.

Id. at 54 n.34.

The Secretary filed a supplemental report from Dr. Sriram and his brief on August 23, 2017.  While Dr. Sriram's report focused on the ADEM diagnosis, he did cite to the Cotton article as support for the timing of enhancing lesions. Exhibit H.  Dr. Sriram expanded his discussion of the lesions from Ms. Frantz's MRI.  He now opined that the T1 lesion(s) were hypointense, which are colloquially known as "black holes."  Black holes develop through a process that takes several weeks.  Thus, Dr. Sriram, again, opined that the lesions from Ms. Frantz's August 12, 2010 MRI must have existed before she received vaccinations on August 6, 2010.

In the Secretary's brief, he argued against an award of compensation on multiple grounds. For purposes of evaluating the pending question about the reasonable basis for Ms. Frantz's claim, the most important arguments concern timing. For Ms. Frantz's potentially pre-existing lesions, the Secretary compared Dr. Sriram's analysis of Ms. Frantz's non-enhancing lesions with the lesions in W.C. with the common thread of the Cotton article. Resp't's Br. at 28-32. Overall for timing, the Secretary argued that even the most extreme immune reactions that cause central nervous system disease take at least two days. But, because Ms. Frantz manifested neurologic symptoms only one day after the vaccination, the vaccination could not have initiated the process leading to her neurologic symptoms. Id. at 33-34.

During the pre-hearing status conference, the undersigned expressed concern for whether Ms. Frantz had a reasonable basis to proceed to the hearing. Order, issued Sept. 14, 2017, at 3. The undersigned declined to determine reasonable basis at that time but noted that the fact that a hearing was being held did not indicate that reasonable basis existed. Id.

The entitlement hearing was held in Washington, DC, from September 27-29, 2017. Although the undersigned had earlier determined that the reports from the experts would constitute their direct testimony, the undersigned allowed the parties to conduct short direct examinations to highlight the important points from the expert's reports. Order, issued Sept. 14, 2017, at 2.

Ms. Frantz's attorney presented testimony from Dr. Tornatore at the beginning of the hearing. During this time, Ms. Frantz elicited no testimony from Dr. Tornatore about the Cotton article or the expected duration of enhancement for lesions. See Tr. 14-59. In response to a question not asked by Ms. Frantz, Dr. Tornatore acknowledged that the Cotton article supported the proposition that the average duration of lesion enhancement is two weeks. Tr. 186.

Due to scheduling issues, Dr. Sriram testified after Dr. Tornatore. Like Ms. Frantz, the Secretary was permitted to present direct testimony orally. Order, issued Sept. 14, 2017, at 2. On direct examination, based on Cotton, Dr. Sriram noted that the mean duration of enhancement of lesions was three weeks with a median duration of two weeks. Tr. 279. Because all lesions have an enhancing phase and Cotton provides a timeframe for how long the enhancing phase could be, Dr. Sriram argued that Ms. Frantz's lesions were at least a certain age since they were no longer enhancing. Tr. 282. On Ms. Frantz's cross-examination of Dr. Sriram, she asked about how quickly a black hole could develop but did not seek clarification of Dr. Sriram's answer:

Q [Ms. Frantz's counsel]. So would [the time period from the vaccination to the August 12, 2010 MRI] be six days?

A [Dr. Sriram]. Right.

Q. Okay. So is that within that 1- to 13-day time frame [of the Cotton article]?

A. Yeah, but she already had hypointensity there. There was T1 hypointense already there at that time.

Q. Okay.

A. It persisted. So the T1 hypointensities will change. The fact that it was T1 hypointense doesn't make it a five-day event –

Q. Okay.

A. -- or a six-day event.

Q. All right. Dr. Sriram, [changing subjects].

Tr. 367-68.

Dr. Steinman also noted the waxing and waning of lesions in 1 to 13 days based on the Cotton article.  Tr. 422-23.  Thus, Ms. Frantz did not present any meaningful evidence that challenged the findings of Cotton.

During Dr. Sriram's testimony, the Secretary referred to Ms. Frantz's MRIs as visual exhibits.  At the conclusion of the hearing, the undersigned issued a bench ruling denying compensation.  Tr. 563-78.  The undersigned found that Ms. Frantz had an onset of symptoms less than two days after receiving the vaccinations.  Tr. 566.  Relying on the Cotton article for the duration of lesion enhancement, the undersigned found that Ms. Frantz's two non-enhancing lesions in the August 12, 2010 MRI pre-dated the vaccinations and, thus, the vaccinations could not have caused Ms. Frantz's injuries.  This conclusion rested on the continuing persuasiveness of the Cotton article, which Ms. Frantz had not refuted, and the persuasiveness of Dr. Sriram's application of the Cotton article to the facts of this case.  Tr. 574-77.  On October 3, 2017, the undersigned issued a written memorialization of the bench ruling.  Ms. Frantz did not move for review of the decision, and judgment was entered on November 6, 2017.

D.    Fees Litigation

On April 27, 2018, Ms. Frantz filed a motion for final attorneys' fees and costs. ("Fees Appl."). The motion seeks a total of $326,914.44 comprised of $199,304.90 in attorneys' fees and $127,609.54 in attorneys' costs. Fees Appl. at 1-2. Although Ms. Frantz had been denied compensation, she did not address the reasonable basis for her vaccine claim. Ms. Frantz's counsel indicated that Ms. Frantz did not personally incur any costs.[5]

The undersigned directed Ms. Frantz to address reasonable basis and whether it can be gained or lost during the pendency of a case. Order, issued May 9, 2018. Ms. Frantz filed a memorandum in support of reasonable basis. Ms. Frantz characterized reasonable basis as an objective inquiry that focuses on the feasibility of a vaccine claim, rather than the claim's likelihood of success. Pet'r's Memo., filed June 25, 2018, at 4-6, 8-9. In support of reasonable basis, Ms. Frantz pointed to (1) her health before and after the vaccinations, (2) to some treating physicians associating the vaccinations with her injuries, (3) the fact that a treating physician filed a VAERS report, (4) that she suffers from a demyelinating disorder of the central nervous system, (5) that many petitioners have received compensation for demyelinating disorders, (6) that well-qualified experts provided opinions in support of her claim, (7) absence of an alternative cause for her injuries, (8) the logical sequence of events from vaccinations to her injuries, and (9) the timing of the onset of symptoms supported by her experts. Ms. Frantz also argued that an entitlement hearing was necessary to determine compensation, and that reasonable basis existed through the hearing, because the bench ruling relied heavily on Dr. Sriram's oral testimony and use of visual MRI exhibits.

The Secretary filed a memorandum on July 6, 2018, arguing that Ms. Frantz never had reasonable basis and that reasonable basis could not be gained or lost during the pendency of a case. Using this view of reasonable basis, the Secretary pointed to Ms. Frantz's pre-existing lesions and the similarity to W.C., as evidence

---

[5] Counsel filed an affidavit from his office manager, Susan Farrell, attesting that the firm made ten unsuccessful attempts to obtain a statement from Ms. Frantz to comply with General Order No. 9. Exhibit 61, filed Apr. 30, 2019. Ms. Farrell further attested that while Ms. Frantz retained the firm she was not required to pay a retainer, to advance any litigation costs, and did not incur any travel costs because she did not attend the entitlement hearing. Id.

that most of the fees and costs sought are "entirely superfluous."  Resp't's Memo. at 16.  Ms. Frantz filed a reply on July 27, 2018.[6]

To further develop the reasonable basis issue, an oral argument was scheduled for March 20, 2019.  In advance of the hearing, the undersigned issued two orders directing the parties to address a non-precedential opinion in R.K., Fed. Cir. No. 2018-1738, in which the Secretary had taken the position that reasonable basis can be gained or lost during the pendency of a case.  Orders, issued Mar. 12 & 15, 2019.   The Secretary advised by informal communication that he was changing his position in this case to conform with the position articulated in R.K.  Thus, the oral argument would no longer need to address whether reasonable basis could be gained or lost during the pendency of case.  The oral argument was held as scheduled.

On April 30, 2019, Ms. Frantz filed a supplemental motion for attorneys' fees and costs.  The motion requested $25,537.47 in attorneys' fees and costs for the memoranda filed regarding reasonable basis and the oral argument.  On May 10, 2019, the Secretary filed a response to the supplemental motion opposing an award based on lack of reasonable basis.  In her reply, Ms. Frantz reiterated her arguments in favor of reasonable basis.

Ms. Frantz's fee application is now ripe for adjudication.  The analysis has two parts.  The first part is whether Ms. Frantz is eligible for any award of attorneys' fees and costs (section II and III below).  Because Ms. Frantz is eligible for some (but not all) of her attorneys' fees and costs, the second part is determining a reasonable amount of compensation (section IV below).

## II.     Standards for Adjudicating Eligibility for An Award of Attorneys' Fees and Costs

Petitioners who have not been awarded compensation are eligible for an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim."  42 U.S.C. § 300aa—15(e)(1).  As the Federal Circuit has stated, "good faith" and "reasonable basis" are two separate elements that must be met for a petitioner to be eligible for attorneys' fees and

---

[6] This filing mainly addressed positions the Secretary later changed and, therefore, it is not relevant to the determination of this motion.

costs.  Simmons v. Sec'y of Health & Human Servs., 875 F.3d 632, 635 (Fed. Cir. 2017).

"Good faith" is a subjective standard.  Id.; Hamrick v. Sec'y of Health & Human Servs., No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).  A petitioner acts in "good faith" if he or she honestly believes that a vaccine injury occurred.  Turner v. Sec'y of Health & Human Servs., No. 99-544V, 2007 WL 4410030, at * 5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).

In contrast to good faith, reasonable basis is purely an objective evaluation of the weight of the evidence.  Simmons, 875 F.3d at 636.  Because evidence is "objective," the Federal Circuit's description is consistent with viewing the reasonable basis standard as creating a test that petitioners meet by submitting evidence.  See Chuisano v. Sec'y of Health & Human Servs., No. 07-452V, 2013 WL 6234660, at *12-13 (Fed. Cl. Spec. Mstr. Oct. 25, 2013) (explaining that reasonable basis is met with evidence), mot. for rev. denied, 116 Fed. Cl. 276 (2014).

The Federal Circuit and judges of the Court of Federal Claims have provided some guidance as to what reasonable basis is *not*.  A petition based purely on "unsupported speculation," even speculation by a medical expert, is not sufficient to find a reasonable basis.  Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994).  The background to Perreira comes from a 1991 decision denying compensation.  The Perreiras alleged that a 1982 administration of the diphtheria-pertussis-tetanus ("DTP") vaccine harmed their daughter, Carly. Initially, the Perreiras maintained that Carly started having seizures four days after the second dose of DTP, based upon the testimony of Carly's mother.  The former Chief Special Master found that Ms. Perreira's testimony was not correct and found, instead, that the seizures started 20 days after the second dose of DTP. Perreira v. Sec'y of Health & Human Servs., No. 90-847V, 1991 WL 117740, at *1 & n.2 (Cl. Ct. Spec. Mstr. June 13, 1991).

Given this sequence of events, the Perreiras attempted to establish a significant aggravation claim.  This alternative claim was based upon the sequence that two weeks after the third dose of DTP, Carly had more seizures.  The former Chief Special Master rejected the Perreiras' claim because there was no support for their expert's opinion that DTP causes harm that would first appear two weeks later.  Id.

After the entitlement proceedings concluded, the Perreiras sought an award for their attorneys' fees and costs.  The former Chief Special Master found that the

Perreiras had a reasonable basis for filing their petition.  <u>Perreira v. Sec'y of Health & Human Servs.</u>, No. 90-487V, 1992 WL 164436, at *2 (Cl. Ct. Spec. Mstr. June 12, 1993).  The decision does not state the reason for finding reasonable basis.

The former Chief Special Master explicitly found that the reasonable basis ceased after the expert submitted a report, noting that the expert's theory "amounted to his own unsupported speculation[,]"  <u>and</u> that the Perreiras' attorney should have recognized that the expert's theory "was legally insufficient to establish causation."  The former Chief Special Master also stated that the Perreiras' attorney recognized that this case "was a 'bad case.'"  <u>Id.</u> at *1-2.

The Perreiras filed a motion for review of the denial of a portion of the attorneys' fees and costs.  The Court of Federal Claims found that the former Chief Special Master's determination that the case lacked a reasonable basis was not arbitrary.  The Court of Federal Claims rejected the petitioners' arguments, including an argument that "counsel had an absolute right to rely on the expert's opinion in pursuing the case."  <u>Perreira v. Sec'y of Health & Human Servs.</u>, 27 Fed. Cl. 29, 33 (1992).

These decisions are the background for the Federal Circuit's discussion of "reasonable basis" in its <u>Perreira</u> opinion.  The Federal Circuit affirmed the former Chief Special Master's decision that the Perreiras lacked a reasonable basis to proceed to a hearing, despite an expert report, because "the expert opinion was grounded in neither medical literature nor studies."  The Federal Circuit explained that "[t]he special master did not require counsel to verify the validity of the expert's opinion, but only required the opinion to be more than unsupported speculation."  <u>Perreira</u>, 33 F.3d at 1377.

<u>Perreira</u> demonstrates that special masters enjoy discretion to find that a claim lacked a reasonable basis when the evidence on which the petitioners relies (there, an expert's report) is rooted in unsupported speculation.  In this context, the Federal Circuit seemed to give some teeth to the term "reasonable basis."  The Federal Circuit declared: "Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorneys' fees and costs by merely having an expert state an unsupported opinion."  33 F.3d at 1377.

Another example of a case exemplifying a deeper than skin-deep look at reasonable basis is an early case from the Vaccine Program, <u>Murphy v. Sec'y of Health & Human Servs.</u>, No. 90-882V, 1991 WL 74931 (Fed. Cl. Spec. Mstr. Apr. 25, 1991).  Today, <u>Murphy</u> is often cited as a well-known case in which a special

master weighed the value of medical records created contemporaneously with the events the medical records described against the value of affidavits created many years later.  The special master found that the medical records were more reliable, 1991 WL 74931 at *5, and the Court of Federal Claims ruled that this finding was not arbitrary.  23 Cl. Ct. 726, 734 (1991), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).  Under the representations presented in the contemporaneously created medical records, the petitioners in Murphy were not entitled to compensation.

A less recognized aspect to Murphy is the ensuing motion for attorneys' fees and costs, which is more relevant to the case at hand.  Although the special master's 1993 decision denying an award of attorneys' fees and costs is unpublished, the opinion on a motion for review states the special master found a lack of reasonable basis because "the medical records and other written records contradict the claims brought forth in the petition."  30 Fed. Cl. 60, 61 (1993).  Upon a motion for review, the petitioners argued that the special master abused his discretion in denying attorneys' fees and costs.  More specifically, the petitioners argued that "because they submitted expert opinion to support their claim, they had a reasonable basis for their case as a matter of law."  Id. at 62.

The Court, however, rejected the petitioners' argument and ruled that the special master was not arbitrary in finding a lack of reasonable basis.  The Court reasoned that an expert report premised on unreliable assertions does not confer reasonable basis:

> [The petitioners'] position assumes that special masters rely upon expert testimony without determining whether it is corroborated by the facts. This position is not plausible, as expert testimony in and of itself does not determine reasonableness. . .. [T]he expert opinion submitted by petitioners was founded upon Mrs. Murphy's version of the events, a version found to be unreliable by the special master.

Id. at 63.

Thus, two appellate authorities demonstrate that the presence of a report from a retained expert, by itself, does not establish reasonable basis automatically.  These two appellate authorities also resolve a difference between the parties in how to assess the evidence in the context of determining whether a reasonable basis supports the claims set forth in the petition.

16

The disputed point concerns whether special masters should consider all the evidence or only evidence favoring the petitioner. Although Ms. Frantz recognizes that in determining whether petitioners have established entitlement to compensation, special masters "may consider all relevant and reliable evidence." Pet'r's Resp., filed June 25, 2018, at 20 (citing Vaccine Rule 8(b)(1)), she advocates for a different approach in considering the question of reasonable basis. In her view, "Case law regarding the reasonable basis analysis focuses on *objective support for petitioner's claim*, but does <u>not</u> often focus on objective evidence submitted by *respondent in defense of petitioner's claim*." <u>Id.</u> (italics and underlining in original). She further argues that special masters, in determining reasonable basis, should not weigh competing evidence. Instead, special masters should borrow from the summary judgment standard and evaluate the evidence in the light most favorable to the petitioner. <u>Id.</u> at 20-21.

The Secretary takes a different view. Noting that Congress did not use the term "summary judgment" in the context of reasonable basis, the Secretary maintains that the summary judgment standard in the reasonable basis inquiry "is fraught with problems." Resp't's Resp., filed July 6, 2018, at 9.

Neither <u>Perreira</u> nor <u>Murphy</u> discussed a summary judgment standard. Instead, in the original decisions from the special masters, the special masters evaluated (or weighed) the evidence. In <u>Perreira</u>, the former Chief Special Master stated the expert's opinion "amounted to his own unsupported speculation," 1992 WL 164436, at *2, and the Federal Circuit endorsed this view, commenting that "the expert opinion was grounded in neither medical literature nor studies." 33 F.3d at 1377. Similarly, in <u>Murphy</u>, the special master found that the expert's opinion did not provide a reasonable basis because the opinion was premised on a sequence of events that did not match the special master's finding of facts. 30 Fed. Cl. at 61-63.

In the absence of any appellate authority requiring a summary judgment standard, the undersigned does not construe the evidence in petitioner's favor. An objective weighing of the evidence is consistent with cases that have placed the burden of establishing the petition's reasonable basis on petitioners. <u>Carter v. Sec'y of Health & Human Servs.</u>, 132 Fed. Cl. 372, 379 (2017) (citing <u>Woods v. Sec'y of Health & Human Servs.</u>, 105 Fed. Cl. 148, 152 (2012) and <u>McKellar v. Sec'y of Health & Human Servs.</u>, 101 Fed. Cl. 297, 305 (2011)). However, the petitioner's burden is to establish the reasonable basis for the claims set forth in the petition. This burden is not the same as the burden of establishing entitlement to compensation. <u>See</u> <u>Chuisano</u>, 2013 WL 6234660, at *12-13.

III.    **Assessment of Reasonable Basis**

To determine whether Ms. Frantz's case passed the evidentiary threshold for reasonable basis, the undersigned will divide her case into phases and evaluate the evidence as of that period.  In analyzing the evidence, the focus will be whether reasonable basis (meaning evidence) supports "the claim for which the petition was brought" — that the Tdap and hepatitis A vaccines caused Ms. Frantz to suffer a demyelinating injury.

A.      Before Dr. Tornatore's First Report[7]

Ms. Frantz filed Dr. Tornatore's first report, exhibit 36, on November 25, 2014.  Until this date, the evidence primarily consisted of Ms. Frantz's medical records.  In treating Ms. Frantz, many doctors presented a chronology of events in which the doctors noted that Ms. Frantz received vaccinations shortly before she started to manifest neurologic problems.  Ms. Frantz has recited them.  Pet'r's Resp., filed June 25, 2018, at 24-31.  Most of these records do not support "the claim for which the petition was brought" in that the treating doctors do not say anything about causation.  See Chuisano, 116 Fed. Cl. at 287 (a "[t]emporal proximity is necessary, but not sufficient" to establish a reasonable basis) (citation omitted).  Similarly, medical records in which a doctor records a medical history in which the *historian* reports an adverse reaction are not helpful.  For example, Ms. Frantz identified a December 6, 2010 record from an ophthalmologist as indicating that she had "a severe reaction to the Hep A and Addisol vaccination."  Exhibit 4 at 32, cited in Pet'r's Resp., filed June 25, 2018, at 28.  But, this quotation, while accurate, is from the history section of the medical report.  The doctor did not comment about any link between the vaccinations and any ophthalmologic injury in his impression.  Id. at 34.  This report does not assist in the evaluation of reasonable basis because Congress dictated that the special masters may not make findings regarding entitlement to compensation "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion."  42 U.S.C. § 300aa–13.  Here, the layperson's recitation of "a severe reaction" is not elevated in status simply because a doctor memorialized it.

However, at least one record from the treating doctors is supportive.  In Ms. Frantz's second trip to an emergency room within a week of the vaccination, the

---

[7] Although this section discusses the evidence before Ms. Frantz filed Dr. Tornatore's report, the filing of an expert report later in a case can supply the reasonable basis to file the petition.  See Hiland v. Sec'y of Health & Human Servs., No. 10-491V, 2015 WL 4985247, at *2 (Fed. Cl. Spec. Mstr. July 31, 2015).

doctor from the emergency room stated that his diagnostic impression was "Central nervous system reaction to hepatitis A vaccine." Exhibit 11 at 828. Unlike the ophthalmologist's report just discussed, this opinion is from the emergency room doctor. As such, it is a "medical record" supporting the claim that the vaccinations caused Ms. Frantz to suffer a demyelinating injury.

In this context, Ms. Frantz also relies upon a doctor's presentation of Ms. Frantz's case to appropriate government officials through the Vaccine Adverse Events Reporting System (VAERS). See Pet'r's Resp., filed June 25, 2018, at 27 and 32. Lauren Kaup did file such a VAERS report on September 16, 2010. Exhibit 21 at 2.[8] Whether the filing of a VAERS report contributes to the evaluation of reasonable basis varies. Compare Santacroce on behalf of J.R. v. Sec'y of Health & Human Servs., No. 15-555V, 2018 WL 405121, ___ Fed. Cl. ___, at *8 (Jan. 5, 2018) (noting special master had erred in failing to credit the submission of a VAERS report) with E.M. by McCoy v. Sec'y of Health & Human Servs., No. 17-875V, 2018 WL 6254274, at *7 (Fed. Cl. Spec. Mstr. Oct. 15, 2018) ("It is otherwise well established in the Program that VAERS data is not persuasive with regard to any causal connection between vaccination and injury, and petitioners cannot rely on such to establish reasonable basis for a claim"). Another option is to look at VAERS reports on a "case by case basis." McKellar v. Sec'y of Health & Human Servs., No. 09-841V, 2012 WL 362030, at *11 n.15 (Fed. Cl. Spec. Mstr. Jan. 13, 2012), mot. for rev. granted on other grounds, 2012 WL 1884703 (Fed. Cl. May 3, 2012).

Here, the value of Dr. Kaup's VAERS report is unclear. Dr. Kaup recorded the date of the vaccinations (August 6, 2010) and the onset of the adverse event (August 7, 2010). Exhibit 21 at 2 (boxes 10 and 11). Dr. Kaup also described Ms. Frantz's clinical course in approximately three sentences. Id. (box 7). However, Dr. Kaup did not state explicitly that she thought the vaccinations caused the ataxia or weakness. Thus, whether Dr. Kaup intended to communicate that she suspected a causal relationship cannot be determined directly.

In sum, this evidence weighs in favor of a finding that Ms. Frantz had "objective" support for a claim that the vaccinations caused her to suffer an injury in her central nervous system. Two related points warrant emphasis. First, the objective evidence is not particularly strong. The objective evidence consists primarily of the emergency room doctor's impression of a "[c]entral nervous

---

[8] Although the VAERS report does not provide information about Dr. Kaup, other material shows that she is a specialist in critical care. See, e.g., exhibit 9 at 135.

system reaction to hepatitis A vaccine." As one piece of evidence, this report is relatively weak. The doctor offered this opinion relatively early in the course of Ms. Frantz's illness, before the extent of her demyelinating injury was detected on an MRI. Further, it is not clear that the doctor's reference to "reaction" encompassed the disease with which Ms. Frantz was eventually diagnosed, multiple sclerosis.

Second, there does not appear to be any evidence pointing against a finding of entitlement. For example, there appears to be no treating doctor who initially rejected the proposition that a vaccine could have injured Ms. Frantz. And, at this stage of the case, the Secretary has not introduced any contrary evidence. Thus, the record, considered as a whole, balances in favor of a finding a reasonable basis.

B.    Dr. Tornatore's First and Second Reports

Although Dr. Tornatore was instructed to answer various questions, his first report (exhibit 35) did not answer all of them. He provided additional information in his second report (exhibit 38). Thus, these reports are treated together.

These reports start to show the shakiness of Ms. Frantz's claim that the vaccinations caused her a neurologic problem. Before Ms. Frantz filed Dr. Tornatore's first report, Ms. Frantz knew that the time between the vaccinations on August 6, 2010 and Ms. Frantz's dizziness on August 7, 2010 was an issue. Resp't's Rep., filed May 1, 2014, at 9-10. Nevertheless, Dr. Tornatore did not present a coherent explanation for how the sequence of events supported a finding of causation. In his first report, he stated that an appropriate interval between vaccination and the manifestation of the symptoms of ADEM was 2-30 days. Exhibit 35. However, despite being instructed to identify the initial manifestation of Ms. Frantz's neurologic injury by exhibit number and page number (Instructions, issued June 16, 2014, at ¶ 6(a)(iii)), Dr. Tornatore did not. Instead, he opined that her symptoms started "several days" after the vaccination. Exhibit 35 at 58.

Dr. Tornatore's statement about "several days" was not credible. Just three days after vaccination, Ms. Frantz's mother reported that her daughter had been off-balance, dizzy, and sluggish since August 7, 2010, which was the day after vaccination. Dr. Tornatore seemed to disregard these symptoms without any explanation.

When instructed a second time to say when Ms. Frantz first manifested a neurologic injury, Dr. Tornatore was more definitive. He identified the dizziness

and sluggish on August 7, 2010 as the initial manifestation.  Exhibit 38 at 6.  This opinion is credible.

However, a one-day interval between the vaccinations and the dizziness made Dr. Tornatore's opinion internally inconsistent.  His first report presented his opinion that two days was the minimal appropriate interval, but his second report said that the interval for Ms. Frantz was one day.  It is important to recognize that this inconsistency comes from what only Dr. Tornatore wrote.  The inconsistency is not due to the Secretary presenting any contrary evidence.

The one-day onset of symptoms is separate from the issue about the formation of lesions that Ms. Frantz's first MRI detected.  From Dr. Tornatore's experience in <u>W.C.</u> and from Ms. Frantz's attorney's experience in <u>W.C.</u>, both were on notice that a finding of non-enhancement probably meant that the lesions did not develop after vaccination.  Dr. Tornatore's first report recited that the August 12, 2010 MRI showed one enhancing and two non-enhancing lesions.  Exhibit 36 at 5, 56.  However, Dr. Tornatore did not address how vaccines administered on August 6, 2010 could cause two lesions that appeared as non-enhanced lesions six days later.

On balance, Dr. Tornatore's first two reports were poor.  They failed to engage the meaningful issues.  However, the reports were not so deficient that they cause Ms. Frantz to lose the reasonable basis that the emergency room doctor's report had conferred upon her.

C.    Dr. Tornatore's Third Report

After Dr. Tornatore's first two reports, the Secretary began to present evidence that further undermined Dr. Tornatore's opinions.  Dr. Sriram's first report stated that the lesion on Ms. Frantz's medulla probably caused her ataxia, which was noted in medical records on August 12, 2010.  Exhibit A at 3 (citing exhibit 9 at 841).  But, Dr. Sriram opined that the process for creating a lesion and for the lesion to go from enhanced to non-enhanced would take longer than six days.  <u>Id.</u> at 6.  Dr. Sriram did not cite Cotton in his first report.

Thus, by the time he wrote his third report, Dr. Tornatore knew that the duration of lesion enhancement was a foundation for Dr. Sriram's opinion that Ms. Frantz's timeline did not fit.  However, Dr. Tornatore did not challenge Dr. Sriram's opinion about the duration of lesion enhancement, leaving Dr. Sriram's opinion unrebutted.  <u>See</u> exhibit 39.

21

Dr. Tornatore's response was to change his opinion in a different respect. As previously discussed, Dr. Tornatore initially proposed that the appropriate temporal interval between vaccination and ADEM was 2-30 days.  Exhibit 36 at 57.  Now, Dr. Tornatore indicated that because Ms. Frantz was previously vaccinated against diphtheria, the August 6, 2010 vaccination was a "rechallenge," meaning that her immune response would be "brisk."  Dr. Tornatore continued: "Indeed the Institute of Medicine recognized that injury from a vaccine can occur 1-3 days following vaccination if an individual has been exposed to a vaccine previously."  Exhibit 39 at 3.

Dr. Tornatore's opinion here is problematic for several reasons.  First, and least significantly, as an expert who has appeared in many Vaccine Program cases, Dr. Tornatore was almost certainly aware of the 2012 IOM report before he wrote his first report in this case.  Dr. Tornatore also should have been aware that the August 6, 2010 diphtheria vaccination was a booster vaccination when he wrote his first report.  However, Dr. Tornatore did not present any opinion about rechallenge then.  Instructions, issued June 16, 2014, at ¶ 7(a)(ii)(1) (expert instructions stating that "petitioner's expert should consider whether [Ms. Frantz's] case contains evidence showing: 1. Challenge-rechallenge").

Second, Dr. Tornatore errs in how he reports what the IOM stated.  Dr. Tornatore extracts one sentence from a section titled "Latency Between Antigen Exposure and Peak Adaptive Immune Response."  Exhibit 39, tab D at 57 (capitalization changed).  The IOM explained that after exposure to an antigen, T cells and B cells move through a "lag phase, logarithmic phase, and plateau phase."  Id.  In the context of describing the immune system's response upon a reexposure, the IOM stated "The lag phase is generally 1 to 3 days; the logarithmic phase of the secondary antibody response occurs over the next 3 to 5 days."  Id.  In presenting his opinion, Dr. Tornatore discussed only the lag phase, a phase that is "characterized by the initial activation of B and T cells, . . . and the trigger[ing] the cells' differentiation into effector and memory cells."  Id.  Dr. Tornatore does not discuss the logarithmic phase, the phase during which B cells and T cells multiply and respond to the antigen.  Dr. Tornatore provided no information about how the damage can happen in the first day of the lag phase.  Furthermore, the IOM did not discuss, in this section, when injuries due to vaccination occur.

Third, even if the IOM could be construed as saying some vaccine injuries could occur within one day, Dr. Tornatore failed to discuss a critical issue for Ms. Frantz, how fast demyelinating lesions could form.  Dr. Sriram already had opined that the sequence of events in Ms. Frantz's case occurred too quickly for the vaccinations to have caused her dizziness on August 7, 2010, or the lesion detected

on the August 12, 2010 MRI.  Exhibit A at 7.  Dr. Tornatore's report did not directly refute Dr. Sriram's opinion on these points.  Dr. Tornatore did not fill in this omission and the lack of meaningful dispute ultimately led to a finding that Ms. Frantz was not entitled to compensation.

At this point, the reasonable basis for Ms. Frantz's continued litigation is doubtful.  She is relying upon an expert, Dr. Tornatore, who has written three poor reports.  Nevertheless, the benefit of the doubt is extended to her and reasonable basis is extended through Dr. Tornatore's third report.[9]

### D.   Dr. Sriram's third report and Dr. Tornatore's fourth report

The Secretary obtained the MRIs for Dr. Sriram so that he could review the actual images, not just the reports about the MRIs.  Order, issued Aug. 28, 2015.  Based upon his review of the MRIs, Dr. Sriram stated that two lesions were non-enhancing.  Dr. Sriram cited Cotton to establish the duration of enhancement.  Putting the non-enhancement of Ms. Frantz's lesions together with the duration of enhancement from Cotton, Dr. Sriram concluded that the vaccinations could not have caused the lesions.  Ms. Frantz must have had those lesions before she was vaccinated.  Exhibit D; see also exhibit 9 at 1385 (radiologist's report).

After the Secretary filed this report, the parties discussed the case in a December 15, 2015 status conference.  The ensuing order stated Ms. Frantz "probably cannot prevail on a claim that vaccination caused her neurologic condition," and cited W.C. v. Sec'y of Health & Human Servs., 704 F.3d 1352 (Fed. Cir. 2013), in support.  Order, issued Dec. 15, 2015.  This assessment, which Vaccine Rule 5 permits, should have warned Ms. Frantz about the continued prosecution of the claim set forth in her petition.  See Rehn v. Sec'y of Health & Human Servs., No. 14-1012V, 2017 WL 1011487, at *6 (Fed. Cl. 2017) (ruling that the special master was not arbitrary in finding no reasonable basis for successor counsel to proceed with a case after the special master had warned the first counsel about the case's weaknesses); Hamilton v. Sec'y of Health & Human Servs., No. 14-785V, 2018 WL 2772197, at *5 (Fed. Cl. Spec. Mstr. April 12, 2018) (finding reasonable basis in an autism case until the case was stayed pending the outcome of certain appeals).

Ms. Frantz continued to pursue her case and she certainly possessed the right to prosecute her case.  This pursuit, however, was in the face of an assessment that

---

[9] This extension makes Ms. Frantz eligible for a relatively small additional amount of attorneys' fees and costs.

based upon Federal Circuit precedent, she was unlikely to prevail.  Ultimately, her efforts did not lead to evidence sufficient to show that she had a reasonable basis to maintain her claim.

The fourth report from Dr. Tornatore does not help Ms. Frantz.  Dr. Tornatore essentially says that if Ms. Frantz had received a triple dose of the agent that creates contrast, gadolinium, and if an MRI were performed with "magnetization transfer contrast and delayed imaging," then the lesions that had appeared as non-enhanced (meaning old) would have appeared as enhanced (meaning new).  Exhibit 40 at 1.  However, Ms. Frantz did not receive a triple dose of gadolinium.  Thus, Dr. Tornatore has no basis to predict how Ms. Frantz would respond to a hypothetical test.  In other words, Dr. Tornatore's fourth report is speculation and expert speculation is the antithesis of reasonable basis.

The reasonable basis that supported the claim in Ms. Frantz's petition ended with the submission of Dr. Tornatore's fourth report.  The fourth report cemented the failure of Ms. Frantz and Dr. Tornatore to answer the fundamental point that Dr. Sriram had raised based upon Cotton:  Ms. Frantz probably had lesions before she was vaccinated.  Arguably, because Dr. Tornatore's fourth report contributed so little to Ms. Frantz's case, the line could have been drawn <u>before</u> the filing of Dr. Tornatore's fourth report.  This view would probably track more closely with the value of the evidence.  However, it also seems fair to allow Ms. Frantz a limited opportunity to respond to Dr. Sriram's third report, which had added Cotton.  Once Ms. Frantz took this opportunity and received another weak report from Dr. Tornatore, Ms. Frantz continued to prosecute her case without reasonable basis.

E.   Remainder of the Case

In finding that Ms. Frantz did not submit evidence after Dr. Sriram's second report to possess a reasonable basis to continue to prosecute her claim, the undersigned has considered the entire record.  This material includes, in chronological order, Dr. Forsthuber's first report (exhibit F), Dr. Tornatore's fifth report (exhibit 42), Dr. Steinman's first report (exhibit 43), Dr. Forsthuber's second report (exhibit G), and Dr. Steinman's second report (exhibit 56).  Collectively, these reports do not address the central issue — the meaning of two non-enhanced lesions on Ms. Frantz's August 12, 2010 MRI.

The undersigned has also considered the April 11, 2017 order for pre-trial briefs and the May 1, 2017 status conference to discuss the expected content of those briefs.  The undersigned raised the issue about the reasonable basis to

24

proceed to the hearing in light of the similarity to W.C.  Although the undersigned is not aware that any appellate tribunal has required a special master to warn attorneys that a case may not have a reasonable basis, the undersigned was attempting to alert Ms. Frantz's attorneys to proceed with caution.

Regardless, Ms. Frantz and her attorneys continued by filing a pre-hearing brief on July 27, 2017.  This brief did not identify errors in Dr. Sriram's opinion that, based upon Cotton's investigation into the duration of lesion enhancement and the findings on Ms. Frantz's August 12, 2010 MRI, Ms. Frantz most likely had lesions in her brain before the allegedly causal vaccinations.  See Pet'r's Prehear'g Br. at 53-55.  In a footnote, Ms. Frantz discussed two other MRIs — one from August 27, 2010 and the other from September 14, 2010.  Id. at 55 n.34.  But, those MRIs are not the critical MRI.  Ms. Frantz ends this footnote with the statement that: "The MRI findings in [her] case illustrate the arbitrariness of the findings in W.C."

This statement is not persuasive for at least two reasons.  First, Ms. Frantz did not produce any evidence in the form of an expert's opinion that called into question the validity of the conclusions Cotton reached.  Second, by describing the factual findings in W.C. as "arbitrary," Ms. Frantz seems to be ignoring or disregarding binding Federal Circuit precedent that found the factual findings in W.C. were not arbitrary.  In short, it appears that Ms. Frantz's attorneys were not evaluating the entire record (see 42 U.S.C. § 300aa–13(a)) dispassionately.

The zealousness with which Ms. Frantz's attorneys may have represented her is not relevant to determining whether a reasonable basis supports the claims set out in the petition.  For example, in Perreira, the petitioner's attorney argued that his ethical obligations to represent his client zealously required him to proceed to a hearing.  However, the Federal Circuit ruled that "counsel's duty to zealously represent their client does not relieve them of their duty to the court to avoid frivolous litigation."  Perreira, 33 F.3d at 1377.

Likewise, in Simmons, the petitioner's attorney argued that an ethical duty also compelled the submission of a petition before the expiration of the time set forth in the statute of limitation.  But, the Federal Circuit held that "objective" evidence — not the actions of counsel — determine whether reasonable basis supports the claims set forth in the petition.  Simmons, 875 F.3d at 635-36.

While Perreira and Simmons (both originating from the Vaccine Program) are controlling precedent, distinguishing between the evidence and counsel's views of that evidence is consistent with the Federal Circuit's jurisprudence in

interpreting a fee-shifting statute for patent litigation.  Pursuant to 35 U.S.C. § 285, district courts may award attorneys' fees and costs for exceptional cases.  See Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545 (2014).  In affirming a trial court's finding that a case was exceptional, the Federal Circuit declared: "We agree, as a general matter, that the extent of a party's pre-suit investigation or how fervently it believed in its allegations does not affect the objective strength of that party's litigating position."  Nova Chemicals Corp. v. Dow Chemical Co., 856 F.3d 1012, 1018 (Fed. Cir. 2017) (affirming award of attorneys' fees), cert. denied, 138 S.Ct. 485 (2017).  By the time Ms. Frantz was submitting her pre-hearing brief, she should have evaluated the "objective" strength of her position and realized that she was not likely to prevail.

After Ms. Frantz filed her pre-hearing brief, the Secretary filed another report from Dr. Sriram that reinforced the strength of the Secretary's position and knocked more holes in Ms. Frantz's claim that the vaccinations caused her demyelinating condition.  Dr. Sriram disclosed an opinion that the August 12, 2010 MRI contained "black hole" lesions.  Exhibit H at 2-3.  Black holes exist only after a process that takes at least 15-27 days.  Id.; Tr. 277-82.

The undersigned's bench ruling and memorialization of that ruling emphasized the persuasiveness of Dr. Sriram's opinion regarding black holes.  Tr. 566-67; 2017 WL 4899415.  In arguing in support of a finding of reasonable basis, Ms. Frantz seizes this finding.  To her, because the dispositive evidence was not presented until exhibit H and reinforced during the hearing, she must have had a reasonable basis through the hearing.

While understandable, this argument is mistaken.  See AFGE Local 3599 v. Equal Employment Opportunity Commission, 920 F.3d 794 (Fed. Cir. 2019) (requiring fee adjudicator to set forth reasons for denial of fees).  The undersigned's worries about the evidentiary basis for Ms. Frantz's claim began much earlier.  The undersigned disclosed concerns about the weakness of Ms. Frantz's objective evidence in the status conference following the filing of Dr. Sriram's third report.  Order, issued Dec. 15, 2015.[10]  As discussed above, Ms. Frantz had multiple opportunities to improve the objective strength of her position but did not.  While Dr. Sriram's opinion regarding black holes was a primary basis for finding that Ms. Frantz was not entitled to compensation, this opinion is not a

---

[10] While Dr. Sriram had not disclosed an opinion about Cotton in his first report (exhibit A), he had reviewed the MRI images between writing his first report and his third report.  See order, issued Aug. 28, 2015.

primary basis for finding that Ms. Frantz lacked a reasonable basis to continue litigation after March 16, 2016.[11]

Similarly, Ms. Frantz argued that W.C. should not prevent a finding that reasonable basis supported her claim throughout the duration of the claim because the Vaccine Program should recognize that science could change.  Oral argument, Mar. 20, 2019, Tr. 15.  This argument could be persuasive when science and knowledge changes.  Here, Ms. Frantz did not controvert the 2003 Cotton study about the duration of lesion enhancement.  When Dr. Tornatore responded to Dr. Sriram's discussion of Cotton, Dr. Tornatore added three articles but all these articles were published before Cotton.  See exhibit 40, Tabs A-C.  Thus, Ms. Frantz's case does not present a situation where the advancement of knowledge causes a different result on the question of whether a vaccine caused an illness.

The evidence in Ms. Frantz's case regarding the duration of lesion enhancement and the presence of non-enhanced lesions on an MRI taken shortly after vaccination closely resembles the evidence in W.C.  Although Ms. Frantz was given opportunities to develop evidence that would persuasively show her case differed from W.C., she did not.  As explained above, by March 16, 2016, the objective evidence no longer supported the claim set forth in her petition.[12]

---

[11] A calendar might clarify this point.  In describing Ms. Frantz's August 12, 2010 lesions as non-enhanced, Dr. Sriram seemed to be suggesting that they were at least three weeks old because the median duration of enhancement is two weeks.  Exhibit A at 7, exhibit D at 2.  This chronology means that Ms. Frantz had lesions in July 2010.  The existence of lesions in July 2010, is sufficient to ground Dr. Sriram's opinion that the vaccinations on August 6, 2010 did not cause Ms. Frantz's demyelinating condition.

When Dr. Sriram disclosed his opinion that two of the August 12, 2010 lesions were black holes (exhibit H), Dr. Sriram was proposing a chronology that placed the creation of those lesions back even earlier.  Because of the duration of the process for creating black holes, the black holes detected on August 12, 2010 meant that Ms. Frantz's lesions may have been present in June.

[12] Again, Ms. Frantz's petition alleged that the vaccines caused her demyelinating injury.  Because the Vaccine Act allows for an award of attorneys' fees and costs when there is "reasonable basis" for the "claim for which the petition was brought," the foregoing analysis has focused on the objective basis for the claim that the vaccines caused Ms. Frantz's demyelination.  42 U.S.C. § 300aa-15(e)(1)(B).  Ms. Frantz's causation-in-fact claim necessarily assumes that she did not have demyelination before the vaccination.

Conceivably, after Dr. Sriram had presented persuasive evidence that Ms. Frantz had lesions before vaccination, she could have amended her petition to allege that the vaccination significantly aggravated her pre-existing and undiagnosed multiple sclerosis.  See Quackenbush-Baker v. Sec'y of Health & Human Servs., No. 14-1000V, 2018 WL 1704523 (Fed. Cl. Spec.

As discussed below, this finding carries a consequence that some work Ms. Frantz's attorneys performed and some work by Dr. Tornatore and Dr. Steinman are not compensable through the Vaccine Program.  This consequence is necessary because Congress required non-prevailing petitioners to establish a reasonable basis to be eligible for an award of attorneys' fees and costs.  Congress's imposition of a reasonable basis standard means that "fee denials are expected to occur."  Chuisano v. Sec'y of Health & Human Servs., 116 Fed. Cl. 276, 286 (2014).

## IV.     Amount of Attorneys' Fees and Costs

After the determination of when reasonable basis supported the claim set forth in the petition, the process for determining a reasonable amount of attorneys' fees and costs is relatively straightforward.  In light of the Secretary's lack of objection to the amount of attorneys' fees and costs, the undersigned has reviewed the fee application for its reasonableness.  See McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018).

The Vaccine Act permits an award of reasonable attorney's fees and costs. §15(e).  The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act.  This is a two-step process.  Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008).  First, a court determines an "initial estimate … by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'"  Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)).  Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings.  Id. at 1348.  Here, because the lodestar process yields a reasonable result, no additional adjustments are required.  Instead, the analysis focuses on the elements of the lodestar formula, a reasonable hourly rate and a reasonable number of hours.

### A.     Reasonable Hourly Rates

Under the Vaccine Act, special masters, in general, should use the forum (District of Columbia) rate in the lodestar calculation.  Avera, 515 F.3d at 1349. There is, however, an exception (the so-called Davis County exception) to this general rule when the bulk of the work is done outside the District of Columbia and the attorneys' rates are substantially lower.  Id. (citing Davis Cty. Solid Waste

Mstr. Mar. 14, 2018).  However, for whatever reason, she did not.  Thus, this decision does not evaluate the reasonable basis for a claim that Ms. Frantz did not assert.

Mgmt. and Energy Recovery Special Serv. Dist. v. U.S. Envtl. Prot. Agency, 169 F.3d 755, 758 (D.C. Cir. 1999)).  In this case, all the attorneys' work was done outside of the District of Columbia.

The undersigned has reviewed the requested rates and finds them largely to be reasonable and in conformance with what the Conway Homer firm attorneys and paralegals have previously been awarded for their work in the Vaccine Program.  See Harris v. Sec'y of Health & Human Servs., No. 16-528V, 2018 WL 5816741, at *1 (Fed. Cl. Spec. Mstr. Sept. 24, 2018); McSorley v. Sec'y of Health & Human Servs., No. 14-919V, 2018 WL 4390500, at *1 (Fed. Cl. Spec. Mstr. Aug. 16, 2018).

B.      Reasonable Number of Hours

The second factor in the lodestar formula is a reasonable number of hours. Reasonable hours are not excessive, redundant, or otherwise unnecessary.  See Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993). The Secretary also did not directly challenge any of the requested hours as unreasonable.

From the inception of the case until March 16, 2016, the attorneys' and paralegals' invoices total $88,255.50.  Within this period, almost all of the billing is reasonable.

Some reduction is required for work considered administrative.  Billing for clerical and other secretarial work is not permitted in the Vaccine Program. Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989); Bennett v. Dep't of Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983); Guy v. Sec'y of Health & Human Servs., 38 Fed. Cl. 403, 407-08 (1997); Rochester v. United States, 18 Cl. Ct. 379, 387 (1989) (denied an award of fees for time billed by a secretary and found that "[these] services … should be considered as normal overhead office costs included within the attorneys' fees rates").  Filing documents is a clerical task for which attorneys should not charge.  See Guerrero v Sec'y of Health & Human Servs., No. 12-689V, 2015 WL 3745354, at *6 (Fed. Cl. Spec. Mstr. May 22, 2015) (citing cases), mot. for rev. den'd in relevant part and granted in non-relevant part, 124 Fed. Cl. 153, 160 (2015), app. dismissed, No. 2016-1753 (Fed. Cir. Apr. 22, 2016).

In addition, the attorneys duplicated work, although this duplication was relatively rare.  See, e.g., entries for 11/14/2014, 5/14/2015.

Finally, a law clerk seems to have spent a relatively lengthy amount of time reviewing medical records.  For example, although exhibit 9 is a critical medical

whose length exceeds two thousand pages, the law clerk spent more than 40 hours on this one exhibit.  See entries, starting 7/1/2013.  Even given the law clerk's relatively low hourly rate due, in part, to the law clerk's inexperience, it appears that the amount of time was excessive.  It may be the case that additional guidance from the experienced attorneys will help the law clerk learn how to review and to summarize medical records efficiently.

In an attempt to administer "rough justice" the undersigned shall reduce the amount of attorneys' fees awarded by $750.00.  Accordingly, a reasonable amount of attorneys' fees during the portion of the entitlement phase of the case in which reasonable basis supported the petition is **$87,505.50**.

C.    Costs Incurred

The finding that reasonable basis did not support Ms. Frantz's claim after March 16, 2016, means that Ms. Frantz is not eligible for reimbursement of expenses incurred after that date.  This limits her claim for costs to $33,169.62.

Like attorneys' fees, a request for reimbursement of costs must be reasonable. Perreira, 27 Fed. Cl. at 34.  Ms. Frantz has provided adequate documentation for costs of medical records and other expenses, other than Dr. Tornatore's work.  Ms. Frantz is awarded these costs ($3,769.62) in full.

The bulk of the costs incurred in the relevant time concern Dr. Tornatore. Reasonable expert fees are determined using the lodestar method, in which a reasonable hourly rate is multiplied by a reasonable number of hours.  Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 779 (2013).

Dr. Tornatore created an invoice in which he has charged $400 per hour for working 73.50 hours before March 16, 2016.  Thus, the amount Dr. Tornatore requested for this period is $29,400.00

Dr. Tornatore's number of hours is reasonable.[13]  Dr. Tornatore spent many hours reviewing and summarizing Ms. Frantz's voluminous medical records. While much of the 56 pages in his report recounting events in Ms. Frantz's medical

---

[13] The only question concerns Dr. Tornatore's charge on July 16, 2016, of 3.5 hours for reviewing MRI films.  In his testimony, Dr. Tornatore stated neurologists can review MRI films in 15-30 minutes, depending on the level of detail.  Tr. 61.

history turned out not to be relevant to the outcome of the case, Dr. Tornatore's efforts were reasonable.

The problem with Dr. Tornatore's first report is not the depth of the first 56 pages — the problem is the thinness of the remaining 3 pages. The final three pages contain Dr. Tornatore's analysis. Dr. Tornatore relied upon the same set of articles he cited previously. See, e.g., Day v. Sec'y of Health & Human Servs., No. 12-630V, CM/ECF entry 34 (articles filed Jan. 24, 2014). Thus, it is not entirely clear why Dr. Tornatore spent as much time as he did in reviewing literature for his first report, although Dr. Tornatore is extended the benefit of the doubt.

While the number of hours is within the outer bounds of reasonableness, Dr. Tornatore's proposed hourly rate ($400 per hour) cannot be accepted. An appropriate rate for an expert depends, in part, on "the nature, quality, and complexity of the information provided." Sabella v. Sec'y of Health & Human Servs., 86 Fed. Cl. 201, 206 (2009).

Here, Dr. Tornatore's work—even the work during the time in which reasonable basis supported the petition—was not commensurate with the work of an expert charging $400 per hour. As previously discussed, in his first report, Dr. Tornatore did not identify when Ms. Frantz's neurologic symptoms began by citing an exhibit number and page number. This failure to comply with instructions as well as failure to comply with other instructions necessitated a second report from Dr. Tornatore, increasing the time that he spent. Then, his second report proposed an (accurate) onset for her neurologic symptoms but this onset was outside the time he proposed as consistent with causation in his first report. And perhaps most importantly, Dr. Tornatore did not consider the significance of the enhanced lesions on Ms. Frantz's MRI.

Thus, for this particular case, a reasonable hourly rate for Dr. Tornatore's work is $250.00 per hour.[14] Cf. Wood v. Sec'y of Health & Human Servs., No. 15-1568V, 2019 WL 518521, at *8 (Fed. Cl. Spec. Mstr. Jan. 11, 2019) (finding that another expert's work was so deficient that no compensation was reasonable). A reasonable amount of compensation for Dr. Tornatore's work is $18,375.00

---

[14] The undersigned is aware that judges and special masters have sometimes accepted Dr. Tornatore's opinions and sometimes rejected his opinions. The undersigned is also aware that Dr. Tornatore has been compensated at $400 per hour. However, Dr. Tornatore's awarded hourly rate in Ms. Frantz's case depends upon Dr. Tornatore's work in this case.

In sum, Ms. Frantz is awarded attorneys' costs of **$22,144.62**.

D.   Petitioner's Costs

Ms. Frantz's attorneys have adequately documented that they attempted to communicate with her to obtain her signature on a statement regarding her costs. They have also represented that Ms. Frantz did not incur any costs. Thus, Ms. Frantz is not awarded any costs personally.

E.   Supplemental Fees

After the oral argument regarding reasonable basis, Ms. Frantz was invited to submit a motion to request compensation for the time her attorneys spent litigating fees.  See Schuenemeyer v. United States, 776 F.2d 329, 333 (Fed. Cir. 1985).  In an April 30, 2019 motion, Ms. Frantz requested an additional $25,537.47 in attorneys' fees and costs.  These fees and costs are reasonable and awarded in full.

**V.   Conclusion**

After a finding of reasonable basis, the Vaccine Act permits an award of reasonable attorney's fees and costs. 42 U.S.C. § 300aa-15(e).  For the reasons explained above, the motion is GRANTED to the extent that the undersigned finds a reasonable amount to be $135,187.59 (representing $113,042.97 in attorneys' fees and $22,144.62 in attorneys' costs).  This shall be paid as follows:

> **A lump sum payment of $135,187.59 in the form of a check made payable jointly to petitioner and petitioner's attorney, Ronald Homer, for all attorneys' fees and costs available under 42 U.S.C. § 300aa-15(e).**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[15]

**IT IS SO ORDERED**.

s/Christian J. Moran<br>
Christian J. Moran<br>
Special Master

---

[15] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.