# In the United States Court of Federal Claims

No. 13-158
(Filed Under Seal: November 13, 2019)
Reissued: December 20, 2019[1]

| | |
|---|---|
| SIERRA FRANTZ, ) | |
| ) | |
| Petitioner, ) | |
| ) | Vaccine Case; Motion for Review; |
| v. ) | Attorneys' Fees; National Vaccine Injury |
| ) | Compensation Program, 42 U.S.C. §§ |
| SECRETARY OF HEALTH AND ) | 300aa-10–34 (2018); Reasonable Basis |
| HUMAN SERVICES, ) | |
| ) | |
| Respondent. ) | |
| ) | |

*Ronald C. Homer & Christina Ciampolillo*, Conway Homer, P.C., Boston, MA, for petitioner.

*Daniel Principato & Debra A. Filteau Begley*, Vaccine/Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

Petitioner, Sierra Frantz, seeks review of a partial award of attorneys' fees and costs issued by Special Master Christian J. Moran. Petitioner brought this action pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10–34 (2018) (hereinafter "Vaccine Act"), alleging that petitioner's multiple sclerosis (hereinafter "MS") was caused by the scheduled tetanus-diphtheria-acellular pertussis (hereinafter "Tdap") and hepatitis A (hereinafter "hep A") vaccinations she received on August 6, 2010. The Special Master denied compensation, finding that petitioner failed to establish that her condition did not pre-date the vaccination, especially given the poor analysis performed by petitioner's expert. *Frantz v. Sec'y of Health & Human Servs.*, 2017 WL 4899415 (Fed. Cl. Spec. Mstr. Oct. 3, 2017) (*Frantz I*). Petitioner subsequently sought attorneys' fees and costs pursuant to the Vaccine Act and was awarded partial fees and costs. *Frantz v. Sec'y of Health & Human Servs.*, 2019 WL 3713942

---

[1]   An unredacted version of this opinion was issued under seal on November 13, 2019. The parties were given an opportunity to propose redactions, but no such proposals were made.

(Fed. Cl. Spec. Mstr. Jun. 24, 2019) (*Frantz II*). This case is now before the Court on petitioner's Motion for Review of that decision. For the reasons that follow, the Court denies petitioner's Motion.

I. **Factual Background and Procedural History**

A brief recitation of the facts provides necessary context.[2]

Ms. Frantz, a healthy and active twelve-year-old, received her scheduled Tdap[3] and hep A[4] vaccinations on August 6, 2010. *Frantz II* at *2. The next day, Ms. Frantz reported feeling off-balance, dizzy, and sluggish. On August 9, 2010, Ms. Frantz's mother called the doctor to report her symptoms, and later went with petitioner to the emergency room. *Id.* After her neurological symptoms worsened, Ms. Frantz received her first magnetic resonance imaging test[5] ("MRI") on August 12, 2010, which revealed one enhancing lesion[6] on her brain stem as well as two non-enhancing lesions on her upper medulla[7] and left periventricular[8] region. *Id.* Following further MRIs, petitioner was diagnosed with MS.[9] *Id.*

---

[2] As the basic facts in this case have not changed significantly, the Court's recitation of the background facts herein draws from the Special Master's decision in *Frantz II*.

[3] The Tdap vaccination "is administered intramuscularly to adolescents and adults, for simultaneous immunization against diphtheria, tetanus, and pertussis." *Dorland's Illustrated Medical Dictionary* 2017 (32nd ed. 2012) (hereinafter "*Dorland's*").

[4] The hep A vaccination is "administered intramuscularly as an immunizing agent for pre-exposure prophylaxis in susceptible persons at least two years of age." *Dorland's* 2016.

[5] A magnetic resonance imaging test is defined as "a method of visualizing soft tissues of the body by applying an external magnetic field that makes it possible to distinguish between hydrogen atoms in different environments." *Dorland's* 916.

[6] A lesion is defined as "any pathological or traumatic discontinuity of tissue or loss of function of a part." *Dorland's* 1025.

[7] The medulla, or medulla oblongata, is defined as "the truncated cone of nerve tissue continuous above with the pons and below the spinal cord" that "contains ascending and descending tracts and important collections of nerve cells that deal with vital functions such as respiration, circulation, and special senses." *Dorland's* 1121.

[8] Periventricular is defined as "around a ventricle." *Dorland's* 1419. The periventricular system is defined as the "collective name for the efferent pathways of the hypothalamus that arise mainly in the supraoptic, posterior, and tuberal nuclei and descend in the periventricular grey matter." *Dorland's* 1862.

[9] Multiple sclerosis is defined as "a disease in which there are foci of demyelination throughout the white matter of the central nervous system, sometimes extending into the grey matter." *Dorland's* 1680.

### A. Entitlement Litigation

On March 3, 2013, petitioner filed a petition under the Vaccine Act, alleging that the Tdap and hep A vaccinations she received caused her to develop a demyelinating[10] disorder of the central nervous system that ultimately led to MS. *Id.* at *3. The Secretary of Health and Human Services recommended against compensation, arguing that compensation was inappropriate because Ms. Frantz had not offered a medical theory connecting her symptoms to the vaccinations and that the temporal connection between the vaccines and onset of the symptoms was insufficient to establish causation. *Id.*

On November 25, 2014, petitioner's expert, Dr. Carlo Tornatore,[11] filed his first expert report, in which he opined that Ms. Frantz likely suffered from acute disseminated encephalomyelitis[12] (hereinafter "ADEM"), that could have begun exhibiting symptoms as early as two days post-vaccination, and that ultimately developed into MS. *Frantz II* at *3. The temporal development of the lesions continued to be a point of contention throughout the litigation preparation and entitlement hearing. *See id.* at *3–*6.

Following an entitlement hearing on September 27-29, 2017, Special Master Moran issued a bench ruling that the evidence supported the respondent's position that Ms. Frantz's pre-clinical MS predated her vaccinations. *Id.* at *7. Citing a 2003 Francois Cotton article[13] ("Cotton article") and a highly similar case recently decided by the Office of Special Masters, *W.C. v. Sec'y of Health & Human Servs.*, No. 07-456V, 2011 WL 4537877 (Fed. Cl. Spec. Mstr. Feb. 22, 2011), *mot. for rev. denied on relevant grounds,* 100 Fed. Cl. 440 (2011), *aff'd*, 704 F.3d 1352 (Fed. Cir. 2013),[14] he found that Ms. Frantz had at least one lesion in her brain that

---

[10]   Demyelination is defined as the "destruction, removal, or loss of the myelin sheath of a nerve or nerves." *Dorland's* 486.

[11]   Dr. Tornatore received an undergraduate degree in neurobiology from Cornell University. Expert Report, ECF No. 50-9 at 2. He earned a master's degree in physiology from Georgetown University and earned his medical degree from Georgetown University School of Medicine. *Id.* At the time of *Frantz II*, Dr. Tornatore was working as the Vice Chairman of the Department of Neurology at the Medstar Georgetown University Hospital and as an Associate Professor of Neurology at the Georgetown University Medical Center. *Id.* He has published over 50 academic articles on neurology and has been an invited lecturer at chapter meetings of the National Multiple Sclerosis Society around the country. *Id.* at 15–18.

[12]   Encephalomyelitis is defined as an "inflammation involving both the brain and the spinal cord." *Dorland's* 613. Acute disseminated encephalomyelitis is defined as "an acute or subacute encephalomyelitis or myelitis characterized by perivascular lymphocyte and mononuclear cell infiltration and demyelination." *Id.*

[13]   In a study examining the developmental time of enhancing and non-enhancing lesions using weekly MRI scans, Cotton and fellow researchers found that half of the studied lesions were enhancing after 14 days. Francois Cotton et al., MRI Contrast Uptake in New Lesions in Relapsing-remitting MS Followed at Weekly Intervals, 60 Neurology 640 (2003).

[14]   *W.C.* presents a very similar allegation that the flu vaccination caused a minor to develop MS. 2011 WL 4537877 at *1. Using the Cotton article to evaluate W.C.'s lesions, the Special

likely existed before the vaccinations, so the vaccines could not have caused her condition. *Id.* Therefore, Ms. Frantz was not awarded compensation. Special Master Moran issued a written memorialization of his bench ruling on October 3, 2017. *Id.*; *see also generally Frantz I*. Petitioner did not file a motion for review of that decision, and judgment was entered on November 6, 2017. *Frantz II* at *7.

### B. Fee Litigation

After the denial of compensation, Ms. Frantz requested $326,914.44 (later amended to $352,451.91) in attorneys' fees and costs. *Id.* Relying heavily on the Cotton article and the ruling in *W.C.*, the Special Master awarded Ms. Frantz $135,187.59. *Id.* at *1. The Special Master based this decision on the following two grounds: (1) the time period during which Ms. Frantz had a reasonable basis for her claim and (2) the actual value of the work for which she was requesting compensation. *Id.* at *11, *20–*21.

In determining the time frame during which petitioner's claim was reasonable, the Special Master performed an in-depth evaluation of each of petitioner's expert reports. *Id.* at *13. The Special Master determined that the findings of emergency room doctors established that a reasonable basis existed for petitioner's claim through the first two expert reports, despite the subpar nature of Dr. Tornatore's submissions. *Id.* However, the third report's failure to address questions regarding the rate of petitioner's lesion enhancement or include a proposed timeline of enhancement brought the claim's reasonable basis into doubt. *Frantz II* at *14 –*15.

The Special Master determined that petitioner's fourth expert report cemented the lack of a reasonable basis for petitioner's claim, as that report was highly speculative and failed to address fundamental issues raised by respondent's expert. *Id.* at *15. As a result, the Special Master awarded petitioner attorneys' fees only for the duration of the case that occurred prior to the point in which petitioner's claim no longer had a reasonable basis. *Id.* at *20.

The Special Master determined the awarded costs based on the period during which petitioner's claim appeared to have a viable reasonable basis—through March 16, 2016—but reduced the attorneys' fees award where the requested compensation was unreasonable. *Id.* at *19–*20. Special Master Moran determined that the reasonable amount of attorneys' fees for the portion of the entitlement phase in which a reasonable basis was supported was $87,505.50, which includes a onetime reduction of $750 to account for discrepancies in the attorneys' reasonable hours. *Id.* at *19. Additionally, the Special Master found that, even during the period in which Ms. Frantz's case had a reasonable basis, the quality of the reports Dr. Tornatore produced was "not commensurate with the work of an expert charging $400 per hour," and, as a

---

Master found that, because lesions had entered the non-enhancing phase 17 days after vaccination, they could not have been caused by the vaccination. *Id.* at *8. On review, the Court, and subsequently Federal Circuit, upheld the Special Master's finding as neither arbitrary nor capricious. *W.C.*, 100 Fed. Cl. at 443; *W.C.*, 704 F.3d at 1354.

result, reduced Dr. Tornatore's rate from $400 per hour to $250 per hour. *Id.* at *20. As a result, the final costs award, which included the payments made to petitioner's expert, totaled $22,144.62. *Frantz II* at *21. The Special Master ultimately awarded petitioner a lump sum of $135,187.59 in attorneys' fees and costs. *Id.*

On July 24, 2019, petitioner filed her Motion for Review of the Special Master's compensation decision. *See generally* Petitioner's Memorandum in Support of the Motion for Review of the Special Master's June 24, 2019 Decision (hereinafter "Pet'r Mem."). Petitioner alleged that the Special Master's decision to only award partial fees was "arbitrary, capricious, an abuse of his discretion, and not in accordance with law." *Id.* at 2–3. On August 22, 2019, respondent filed its Response, arguing that petitioner failed to identify reversible error and that the Special Master was acting within his discretion. *See generally* Respondent's Response to Petitioner's Motion for Review (hereinafter "Resp't Mot."). Petitioner's Motion is fully briefed and ripe for review.

## II. Standard of Review

Under the Vaccine Act, this Court may review a special master's decision upon the timely request of either party. *See* 42 U.S.C. § 300aa-12(e)(1)–(2). Upon receiving a timely request, the Court may "(A) uphold the findings of fact and conclusions of law . . . , (B) set aside any findings of fact or conclusion of law . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . , or, (C) remand the petition to the Special Master for further action in accordance with the court's direction." *Id.* § 300aa-12(e)(2)(A)–(C). Findings of fact and discretionary rulings are reviewed under an "arbitrary and capricious" standard, while legal conclusions are reviewed *de novo*. *Munn v. Sec'y of Health & Human Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).

The arbitrary and capricious standard that the Court applies to factual findings is a "uniquely deferential" standard. *Veryzer v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 344, 350 (2011) (citing *Doe v. Sec'y of Health & Human Servs.*, 601 F.3d 1349, 1355 (Fed. Cir. 2010)); *see also Munn*, 970 F.2d at 869–870 (emphasizing that the arbitrary and capricious standard is "well understood to be the most deferential possible."). The Federal Circuit has held that in cases where the special master "has considered the relevant evidence in the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

## III. Discussion

### A. Reasonable Basis Review

Under the Vaccine Act, a special master may award reasonable attorneys' fees and costs even if the petitioner does not prevail on their vaccine claim. 42 U.S.C. § 300aa-15(e)(1) (2018).

5

Awarding fees and costs to a failed claim brought under the Vaccine Act is not mandatory and occurs only after determining that the petition was "brought in good faith and there was a reasonable basis for the claim." *Id.* At issue here is the life of the reasonable basis of the claim, as petitioner alleges that the Special Master arbitrarily determined that the reasonable basis ended after petitioner filed her fourth expert report.

In the context of the Vaccine Act, "good faith" is a subjective standard that "focuses upon whether the petitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Human Servs.*, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007) (citing *Di Roma v. Sec'y of Dept. of Health & Human Servs.*, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)). If the special master determines that "petitioner held an honest belief that he has sustained a vaccine-related injury," and that petitioner had not acted in bad faith, the special master may then "make a presumptive factual finding of good faith." *Id.* at *5 (citing *Grice v. Sec'y of Dept. of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996)).

Petitioner clearly held an "honest belief" that she had sustained a vaccine injury throughout the early stages of her claim. Petitioner underwent an extensive litigation process, including hiring an expert witness and spending upwards of $325,000. *See generally* Pet'r Mem. Moreover, the Special Master found no evidence of bad faith on the part of Ms. Frantz. *Frantz II* at *8.

A determination regarding the "reasonable basis" requirement" is "objective, looking not at the likelihood of success" of a claim but more to the viability of the claim. *Woods v. Sec'y of Dept. of Health & Human Servs.*, 2012 WL 4010485, at *5 (Fed. Cl. Spec. Mstr. Aug. 23, 2012) (*Woods III*) (quoting *Turner*, 2007 WL 4410030, at *6). Such a determination considers the totality of circumstances of a petitioner's claim, analyzing factors such as "'the factual basis, the medical support . . . [and] jurisdictional issues,' including the statute of limitations. . . when considering whether there was a reasonable basis for a claim." *Spahn v. Sec'y of Health & Human Servs.*, 133 Fed. Cl. 588, 599 (2017) (quoting in relevant part *Simmons v. Sec'y of Health & Human Servs.*, 105 Fed. Cl. 579, 583 (2016) (citing *Chuisano v. United States*, 116 Fed. Cl. 276, 288 (2014))). While special masters often look to expert reports in analyzing whether there is a reasonable basis for a petitioner's claim, "expert testimony in and of itself does not determine reasonableness." *Murphy v. Sec'y of Dept. of Health & Human Servs.*, 30 Fed. Cl. 60, 62 (1993).

Additionally, a petition may have a reasonable basis when initially filed but lack a reasonable basis at a later phase if, among other things, "an expert report is unsupported and deficient." *Woods III*, 2012 WL 4010485, at *5. In such a case, a partial award of attorneys' fees and costs is permitted for the duration of the case up to and until a petitioner's theory of causation is discredited. *See, e.g.*, *Hooker v. Sec'y of Health & Human Servs.,* 2017 WL 3033940, at *22 (Fed. Cl. Spec. Mstr. Apr. 11, 2017) (declining to award attorneys' fees and costs incurred after petitioner's causation theory was rejected).

Petitioner contends that the Special Master improperly relied on the Cotton article in determining whether there existed a reasonable basis for her claim, arguing that the small size of the research survey and the averages it produced should not overshadow the totality of Ms. Frantz's circumstances. Pet'r Mem. at 22–23. However, the Court affords special masters wide latitude in determining the weight of evidence, and, absent "extreme circumstances," will not substitute its judgment for that of the special master. *Munn v. Sec'y of Health & Humans Servs.*, 21 Cl. Ct. 345, 350 (1990), *aff'd*, 970 F.2d 863 (Fed. Cir. 1992); *see Holmes v. Sec'y of Health & Human Servs.*, 115 Fed. Cl. 469, 483 (2014) (citing *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1362 (Fed. Cir. 2000)) ("A special master's 'assessments of the credibility of the witnesses' and of 'the relative persuasiveness of the competing medical theories of the case' are 'virtually unchallengeable on appeal.'"). Given this deference, the Court will not overturn the Special Master's determination that the Cotton article called Dr. Tornatore's findings into question and discredited petitioner's causation theory. Petitioner may disagree with Special Master Moran's evaluation of the relevant evidence and competing medical theories, but that does not in itself satisfy the high bar set by the arbitrary or capricious standard.

The Special Master determined that Ms. Frantz's claim ceased to maintain the reasonable basis created by the original documentation of her claim when Dr. Tornatore was unable to counter respondent's evidence regarding Ms. Frantz's lesions. On several occasions, respondent presented evidence that Ms. Frantz's lesions may have predated her vaccinations. *See Frantz II* at *3–*6. In an April 30, 2015 report, Dr. Subramaniam Sriram,[15] respondent's expert, asserted that the lesions that resulted in Ms. Frantz's muscular failure likely could not have developed in the two days after the vaccination. *Frantz II* at *3. Moreover, it was unlikely that the lesions developed in the six days between the vaccinations and Ms. Frantz's first MRI on August 12, 2010. *Id.* In a December 4, 2015 report, Dr. Sriram reiterated her concerns regarding the low likelihood that Ms. Frantz's lesions would develop, present on an MRI as enhancing, and then present on an MRI as non-enhancing within the post-vaccination window. *Id.* at *4. In response, Dr. Tornatore neither challenged the validity of the timeline established by the Cotton article nor responded to Dr. Sriram's findings, but instead questioned the MRI techniques utilized. *Id.*

The Special Master's reasonable basis determination is not arbitrary as it directly and temporally relates to the point in which Ms. Frantz's theory of causation was clearly discredited. Petitioner's causation theory was discredited when petitioner's expert failed to dispute evidence that petitioner's lesions and resulting neurological condition pre-dated the vaccination.

---

[15] Dr. Sriram received an M.B. and a B.S from the University of Madras, in Madras, India. Literature and C.V of Dr. Sriram, ECF No. 59-4 at 1. He served as a Medicine Intern and Internal Medicine Resident at Wayne State University before becoming a Neurology Resident, the Chief Neurology Resident, and Post-Doctoral Fellow of Neuroimmunology at Stanford University. *Id.* At the time of *Frantz II*, Dr. Sriram was working at Vanderbilt University as the William Weaver Professor of Experimental Neurology and the Joint appointment Professor of Pathology, Microbiology, and Immunology. *Id. at 2*. Dr. Sriram has received multiple grants from the National Multiple Sclerosis Society and hosted MS work shops around the country. *Id.* at 3–4, 6–7.

7

Petitioner alleges that the Special Master inappropriately "treat[ed] his reasonable basis analysis and his entitlement analysis *exactly the same*." Pet'r Mem. at 26 (emphasis in original). The Court disagrees with petitioner's understanding. While petitioner had a reasonable basis for filing her initial claim, once the foundation of Ms. Frantz's causation theory was clearly discredited, there was no longer a reasonable basis for the continued pursuit of that claim. *See Cottingham v. Sec'y of Health & Human Servs.*, 134 Fed. Cl. 567, 573 (2017) ("The Special Master ultimately held that . . . Petitioner had failed to prove that her claim had a reasonable basis, finding the medical records collected at the time the petition was filed did not support causation . . . .").

Reasonable-basis review requires objective evidence of the reasonable basis of claim. *See Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017) (establishing a baseline of objective evidence for a reasonable basis review). Dr. Tornatore's failure to dispute evidence that the lesions pre-dated the vaccination triggered the point at which continued pursuit of a claim with a discredited causation theory was without a reasonable basis. Special Master Moran performed a thorough examination of litigation to pinpoint exactly when the claim could no longer retain a reasonable basis, and awarded Ms. Frantz "the benefit of the doubt," even when "the reasonable basis for Ms. Frantz's continued litigation [became] doubtful." *Frantz II* at *15. Moreover, the Special Master warned the petitioner that, due to the strong parallels to *W.C.*, the claim likely lacked a reasonable basis. *Id.* at *6. Therefore, it seems clear to the Court that the Special Master's evaluation centered not around the likelihood that the claim would succeed, but, rather, on an objective evaluation of the relevant medical information that served as the basis for petitioner's claim.

Petitioner asserts that Special Master Moran contradicted himself in determining the onset of Ms. Frantz's symptoms and establishing a timeline for enhancing versus non-enhancing lesions. *See* Pet'r Mem. at 18–19, 23–24, 26. Petitioner specifically points to statements from the bench that Ms. Frantz's symptom's likely developed within 36 hours of the vaccination, which fell within the proposed timeline that the Special Master ultimately found inconsistent. *Id.* at 19–20. Petitioner's assertion fails for two reasons. First, much like *W.C.*, where the Court found the petitioner's proposed timeline was possible but deferred to the Special Master's discretionary determination that the respondent's timeline was more likely, here Special Master Moran was appropriately exercising his discretion by determining that the respondent's proposed timeline, which claimed that Ms. Frantz's condition pre-dated the vaccination, was more likely. *See Frantz II* at *7; *see also Munn*, 21 Cl. Ct. at 350 ("In the [Vaccine Program], weight given evidence in the record is a matter particularly within the responsibilities of the special master."). Second, petitioner fails to distinguish between the onset of Ms. Frantz's symptoms and the onset of her condition. The Court acknowledges a single onset of a condition. *See Shalala v. Whitecotton*, 514 U.S. 268, 274 (1995) ("There cannot be two first symptoms or onsets of the same injury."). Therefore, given Special Master Moran's determination that the *condition* predated the vaccination, the onset of symptoms in relationship to the vaccine is irrelevant. *See Frantz II* at *7.

8

### B. Hourly Rate Reduction

A special master's determination of attorneys' fees is highly discretionary. *See Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1520 (Fed. Cir. 1993) ("The determination of the amount of reasonable attorneys' fees is within the special master's discretion."); *see also Caves v. Sec'y of Health & Human Servs.*, 111 Fed. Cl. 774, 778 (2013) ("A special master's determination of reasonable attorneys' fees and costs in a Vaccine Act case is a discretionary ruling that is entitled to deference . . . ."). In calculating such an award, a special master must determine whether "the hours spent [by an expert] on the case were reasonable." *Wilcox v. Sec'y of Dept. of Health & Human Servs.*, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997).

The Court has held that "[f]ees for experts are subject to the same reasonableness standards as fees for attorneys." *Crossett v. Sec'y of Dept. of Health & Human Servs.*, 1990 WL 293878, at *4 (Fed. Cl. Spec. Mstr. Aug. 3, 1990). For attorneys, a reasonable hourly rate is the rate "prevailing in the community for similar services by lawyers of a reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984). "Hours that are excessive, redundant, or otherwise unnecessary," are not compensable. *Saxton*, 3 F.3d at 1521 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).

In determining the appropriate compensation for experts, a special master may consider the following factors:

> (1) [T]he witness' area of expertise; (2) the education and training required to provide the expert insight that is sought; (3) the prevailing rates for other comparably respected available experts; (4) the nature, quality and complexity of the [information] provided; (5) the cost of living in the particular geographic area; and (6) any other factor likely to be of assistance to the [Special Master] in balancing the interests implicated by the [Vaccine Act].

*Wilcox*, 1997 WL 101572, at *4 (citing *McClain v. Owens-Corning Fiberglass Corp.*, 1966 WL 650524, *3 (N.D.Ill.)). Special masters "are also entitled to use their prior experience in reviewing fee applications." *Saxton*, 3 F.3d at 1521 (citing *Farrar v. Sec'y of Dept. of Health & Human Servs.*, 192 WL 336502, at *2–*3 (Cl. Ct. Spec. Mstr. Nov. 2, 1992)).

The Court applies the lodestar approach "to determine what constitutes 'reasonable attorneys' fees' under the Vaccine Act." *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1347 (Fed. Cir. 2008) (citing *Saxton*, 3 F.3d at 1521). Using that approach, the Court "first determines an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* at 1347–48 (quoting *Blum*, 465 U.S. at 888). Once the initial calculation has been made, the Court will then "make an upward or downward departure to the fee award based on other specific findings." *Avera*, 515 F.3d at 1348 (citing *Blum*, 465 U.S. at 888).

Petitioner does not dispute the initial estimate of reasonably expended hours, but, rather, she alleges that the Special Master's decision to reduce the hourly rate was an abuse of discretion. Pet'r Mem. at 35. During the compensable period of litigation, Dr. Tornatore spent 73.5 hours on the case, at $400 per hour, for a total of $29,400.00. *Frantz II* at *20. However, Special Master Moran found that, of the fifty-nine pages in Dr. Tornatore's report, fifty-six were summarizations of medical records that "turned out not to be relevant to the outcome of the case," and only three pages contained substantive analyses. *Id*.

Petitioner argues that the Special Master inappropriately relied on the Cotton article and *W.C.* in reducing expert fees. *See* Pet'r Mem. at 39. Additionally, petitioner claims that the fee reduction runs contrary to Congress' intent in enacting the Vaccine Act—to encourage qualified experts to support petitioners litigating under the Act. *See id.* at 40–41. For the reasons set forth above, the Special Master exercised appropriate discretion in relying on the Cotton article and *W.C.* in calculating expert fees. Dr. Tornatore's failed to address either the Cotton article or *W.C.*, or to respond to evidence contradicting his medical theory. The Special Master may exercise his discretion in considering such an omission when determining the value of Dr. Tornatore's work.

Despite petitioner's arguments related to Dr. Tornatore's experience and past participation in the program, the Special Master acted within the bounds of his discretion in determining that the expert's work was not worth the charged hourly rate. The Court has acknowledged that prior participation in cases before the Office of the Special Masters does not create an assumption of credibility or performance when the quality of testimony is substandard. *See*, *e.g.*, *A.W. v. Sec'y of Health & Human Servs.*, 2019 WL 518512, at *7 (2019). Special masters determine the value of an expert's work on an individual case basis. As such, Special Master Moran was well within the bounds of his discretion in reducing the compensation for Dr. Tornatore's work on *this* case, regardless of his qualifications and history with the Court.

While the Court acknowledges the importance of petitioner access to quality expert support, it also recognizes the danger of rewarding experts for mere participation—particularly when such participation is substandard. Capable experts would not be encouraged to participate in vaccine litigation if their work was rewarded, and subsequently compensated, at the same rate as substandard experts. *See A.W.*, 2019 WL 518512, at *8 ("A system in which experts would be paid substantial amounts of money, regardless of the quality of their opinion, may harm future petitioners whose cases would be delayed as special masters resolved other weak cases buttressed by baseless expert opinions . . . ."). Therefore, the Court finds that the Special Master's decision to reduce the fee award was neither arbitrary, capricious, nor contrary to law.

## IV.     Conclusion

This Court finds that the Special Master's decision was neither an abuse of discretion nor contrary to law, and that the Special Master's findings were neither arbitrary nor capricious. For

the foregoing reasons, petitioner's Motion for Review of the Special Master's June 24, 2019 Decision is hereby **DENIED**.  The Clerk of Court is directed to enter judgment, consistent with this opinion.

    **IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge
